UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>Nicholas MARTINEZ | Crim. No. 16-503 (KM)<br><br>**OPINION & ORDER** |

**MCNULTY, District Judge**

    The defendant, Nicholas Martinez, pled guilty in 2016 to conspiracy to distribute heroin, in violation of 21 U.S.C. § 846. On March 30, 2017, this court sentenced him to 90 months' imprisonment. (DE 69) He is currently serving that sentence at a federal institution, FCI Butner Medium I. His projected release date, assuming accumulation of all good time credits, is June 18, 2023. He has filed a motion (DE 72) seeking compassionate release pursuant to the First Step Act 18 U.S.C. § 3582(c)(1)(A). For the reasons stated herein, the motion is denied.

    **I.    EXHAUSTION OF ADMINISTRATIVE REMEDIES**

    The motion must be denied for the threshold reason that there is no indication that Mr. Martinez exhausted his administrative remedies with the Bureau of Prisons.

    Section 3582(c) provides that a court may modify a term of imprisonment only "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." The requirement is a rigid one—as the Third Circuit has characterized it, a "roadblock" to judicial consideration of compassionate release. *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *see also United States v. Epstein*, Crim. No. 14-287, 2020 WL 1808616 (D.N.J.

April 9, 2020) (Wolfson, C.J.). For this reason alone, the motion must be denied, albeit without prejudice to renewal after exhaustion of administrative remedies.

## II. THE MERITS

For completeness, I nevertheless consider in the alternative the grounds proffered for release. Even if I considered them, they would not merit relief.

### A. Legal Standards

Once a term of imprisonment has been imposed, the Court may modify it only under very limited circumstances. *In re Morris*, 345 F. App'x 796, 797–98 (3d Cir. 2009) (citing 18 U.S.C. § 3582(c)). As relevant here, § 3582(c)(1) provides as follows:

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--
>
> > (i) extraordinary and compelling reasons warrant such a reduction; [. . .]
> >
> > and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*See also United States v. Pawlowski*, 967 F.3d 327, 329–30 (3d Cir. 2020). The United States Sentencing Commission has promulgated a policy statement that, in relevant part, allows a court to grant compassionate release or a sentence reduction where: (i) extraordinary and compelling reasons warrant a

reduction in a defendant's sentence; (ii) the defendant is not a danger to the safety of others or to the community; and (iii) release from custody complies with the section 3553(a) factors, to the extent applicable. U.S. SENTENCING GUIDELINES MANUAL ("U.S.S.G.") § 1B1.13 (U.S. SENTENCING COMM'N 2018).

The Sentencing Commission issued a policy statement defining certain circumstances that qualify as extraordinary and compelling. U.S.S.G. § 1B1.13, Application Note 1(A)–(D).[1] That policy statement was enacted at a time when only the BOP could move for compassionate release, however, and has not been amended since the enactment of the First Step Act. In prior cases, I accepted the emerging near-consensus that where a defendant makes a motion under the First Step Act, the court is not bound by that application note. The U.S. Court of Appeals for the Third Circuit, in a precedential decision, has now joined that consensus:

> The first issue is whether the District Court was bound by the Commission's policy statement. We conclude that it was not.
>
> As the District Court noted, the text of the policy statement explicitly limits its application to Bureau-initiated motions. Thus, according to its plain language, the existing policy statement is not applicable—and not binding—for courts considering prisoner-initiated motions. In reaching this conclusion, we align with nearly every circuit court to consider the issue. *See United States v. Brooker*, 976 F.3d 228, 235 (2d Cir. 2020); *United States v. McCoy,*

---

[1] The application note lists three specific circumstances that qualify as extraordinary and compelling. Generally speaking, the enumerated circumstances include: (i) a terminal illness or a serious medical condition that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover; (ii) the defendant is at least 65 years old, is experiencing a serious deterioration in physical or mental health because of the aging process, and has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less; or (iii) certain family circumstances exist where the defendant would be the only available caregiver for his or her minor child, spouse, or registered partner. U.S.S.G. § 1B1.13, Application Note 1(A)–(C). In addition, the Sentencing Commission included a catchall provision, which provides that "other reasons" may be sufficient if "[a]s determined by the Director of the [BOP], there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in [the enumerated] subdivisions." *Id.*, Application Note 1(D).

> 981 F.3d 271, 282 (4th Cir. 2020); *United States v. Shkambi*, 993 F.3d 388, 393 (5th Cir. 2021); *United States v. Elias*, 984 F.3d 516, 519–20 (6th Cir. 2021); *United States v. Gunn*, 980 F.3d 1178, 1180–81 (7th Cir. 2020); *United States v. Aruda*, 993 F.3d 797, 802 (9th Cir. 2021); *United States v. McGee*, 992 F.3d 1035, 1050 (10th Cir. 2021); *United States v. Long*, 997 F.3d 342, 355 (D.C. Cir. 2021). *But see United States v. Bryant*, 996 F.3d 1243, 1247–48 (11th Cir. 2021).

*United States v. Andrews*, 12 F.4th 255, 259 (3d Cir. 2021).

Thus the Guidelines policy statement does not limit what this Court, within its reasonable discretion, may find to be "extraordinary and compelling." Still, it remains a relevant and valuable guide, and is properly considered by a district court:

> The [district] court correctly recognized that although the policy statement is no longer binding, it still sheds light on the meaning of extraordinary and compelling reasons. "It is a commonplace of statutory interpretation that 'Congress legislates against the backdrop of existing law.'" *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, ––– U.S. ––––, 139 S. Ct. 1881, 1890, 204 L.Ed.2d 165 (2019) (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 398 n.3, 133 S.Ct. 1924, 185 L.Ed.2d 1019 (2013)). Because Congress reenacted the compassionate-release statute without any alterations to the phrase "extraordinary and compelling reasons," it was reasonable for the court to conclude that the phrase largely retained the meaning it had under the previous version of the statute. *See United States v. Johnman*, 948 F.3d 612, 619 (3d Cir. 2020) . . . .

*Andrews*, 12 F.4th at 260.

I therefore consider the grounds asserted by the defendant, whether or not specifically authorized by the Guideline policy statement. In particular, I consider whether the grounds cited here rise to the level of extraordinary and compelling circumstances, and, if so, whether the purposes of sentencing would nevertheless be unduly undermined if defendant were released.

### B. Extraordinary and compelling circumstances

Mr. Martinez's First Step Act application for reduction of sentence rests primarily on the danger to his health from a COVID-19 infection while in the

4

institutional setting of FCI Butner Medium I. Mr. Martinez cites asthma as the basis for a finding that his medical circumstances are extraordinary and compelling. Logically, any assessment of extraordinary circumstances arising from the COVID-19 pandemic must consider first, the person's susceptibility to COVID infection with severe consequences as a result, and second, the more general danger of infection at the institution where the person is incarcerated.

### 1. Asthma as risk factor

Courts, including this one, have routinely looked to the Centers for Disease Control ("CDC") for guidance as to conditions that place a person at particular risk of serious consequences from a COVID-19 infection. *See People With Certain Medical Conditions*, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (updated as of April 29, 2022) (cited herein as "CDC List"). "Older adults," *i.e.,* those over age 65, are far more likely than young persons to suffer serious consequences, and account for some 81% of COVID deaths. *Id.* Certain listed medical conditions are also recognized as risk factors. These include "Asthma, if it's moderate to severe." *Id.*[2]

Mr. Martinez, aged 49, is not an "older adult," and will not be one at the time of his presumptive release date. He cites his asthma, which he characterizes as "severe." Prison medical records (filed under seal at DE 74, and cited as "Ex. A") confirm that he has asthma, but do not support a finding of severe asthma.[3]

---

[2] The more complete list, in abbreviated form, consists of Cancer, Chronic kidney disease, Chronic liver disease, Chronic lung disease (including "Asthma, if it's moderate to severe"), Dementia, Diabetes, Down syndrome, Heart conditions (and "possibly high blood pressure (hypertension)"), HIV infection, Immunocompromised state, Mental health conditions, Overweight and obesity, Pregnancy, Sickle cell disease, Smoking, Solid organ or blood stem cell transplant, Stroke, Substance use disorders, and Tuberculosis. *Id.*

[3] Asthma is classified at four levels of severity:

> **Intermittent Asthma** — You have symptoms less than twice a week and wake up less than two nights a month.
> **Mild Persistent Asthma** — You have symptoms two or more days a week and wake up three to four nights a month.

Martinez has received regular medical evaluations and appropriate care. His SaO2 levels have generally been measured 97% to 100%, with one reading of 92% on December 31, 2021. (Ex. A at 65, 239) A sampling of his medical history follows:

On July 7, 2021, Mr. Martinez made reference to asthma and seasonal allergies, and stated he had nasal congestion. (Ex. A at 181.) He had a medical evaluation on July 14, 2020, during which he reported no current respiratory issues, and his SaO2 level was 99%. He stated that his last asthma attack was several years prior. He stated he had not been using an inhaler, and was prescribed an inhaler for use in case of an asthma attack, but not daily. (Ex. A at 34, 36; *see also* medication summary, Ex. A at 86). In September 2021, his respiratory system was found to be within normal limits. He reported using an inhaler, but stated he had had no recent asthma flares or hospitalizations in several years. His SaO2 level was 100%. (Ex. A at 152–53). In October 2021, however, Martinez complained of wheezing and asthma problems. He received one albuterol nebulizer treatment, and reported feeling better. (Ex. A at 130, 303).  In November and December, 2021, he had multiple medical appointments, in which his SaO2 level was measured at 99%. He complained of dermatological and knee problems, but not of asthma. His inhaler prescription was regularly renewed, again with the direction to use only as needed to relieve asthma attacks. (Ex. A at 122–29, 296)

The defendant is fully ambulatory and the records show no significant restrictions in performing all normal activities of daily living. He is able to care for himself.

Even in the pre-vaccination era, release was regularly denied based on such chronic, controlled conditions, which are not out of the ordinary. *See*

---

**Moderate Persistent Asthma** — You have symptoms at least every day and wake up one or more nights a week.
**Severe Persistent Asthma** — You have symptoms during the day and wake up every night due to asthma.

Asthma and Allergy Foundation of America, "Asthma Diagnosis," https://www.aafa.org/asthma-diagnosis/ (last visited May 2, 2022).

*United States v. Coleman*, 848 F. App'x 65, 66 (3d Cir. 2021) (upholding denial of release to inmate with "well managed" conditions of "asthma (moderate-severe), HIV, and hypertension"); *United States v. Pawlowski*, 967 F.3d 327, 330 (3d Cir. 2020) (in pre-vaccine era, denying compassionate release application of inmate who had hypertensive heart disease, COPD, sleep apnea, and only one lung); *United States v. Scalea*, No. 18- 00620, 2021 WL 395874, at *2 (D.N.J. Feb. 4, 2021) (denying compassionate release to an inmate with asthma and hypertension because he did not "fall within the class of people most vulnerable to the virus"); *United States v. Tull*, No. 15-622, 2020 WL 6381250, at *3 (D.N.J. Oct. 30, 2020) (collecting cases for the proposition that "[m]ultiple decisions in this District have denied compassionate release to inmates suffering from asthma, hypertension, and/or other health issues, despite the risk of COVID-19.").

In short, Mr. Martinez has an asthma condition, which is treated conservatively with an inhaler and appears to be well controlled. There is nothing severe, extraordinary or compelling about these circumstances.

### 2. Vaccination

The likelihood of a COVID-19 infection has also been greatly reduced by vaccination of Mr. Martinez and others at the prison.

Prison medical records disclose that Mr. Martinez has twice been vaccinated against the COVID-19 virus. He received the Moderna vaccine on April 20, 2021, and the Janssen (Johnson & Johnson) vaccine on July 30, 2021. (Ex. A at 170, 270)

The available vaccines (Pfizer, Moderna, and Johnson & Johnson) have been shown to be highly effective at preventing infection and, when breakthrough infections occur, at reducing the severity of symptoms. *See* The Possibility of COVID-19 after Vaccination: Breakthrough Infections, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/why-measure-effectiveness/breakthrough-cases.html (last updated Dec. 17, 2021). The wide availability of vaccines tends to render the COVID-19 risk less

extraordinary or compelling. The rates are constantly changing, of course, but the CDC summarize their effectiveness data as follows:

- **People who were unvaccinated had a greater risk of testing positive for COVID-19 and a greater risk of dying from COVID-19 than people who were fully vaccinated** . . . .
- **Unvaccinated people in all age groups had higher case and death rates than fully vaccinated people in the same age groups.**
- **Case and death rates for people fully vaccinated with any of the three vaccine types (Moderna, Pfizer-BioNTech, Johnson & Johnson's Janssen) were much lower than for unvaccinated people.**

https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status

As a proxy for severity, the CDC report the following hospitalization data:

In February [2022], compared to fully vaccinated persons in each group shown below, the monthly rates of COVID-19-associated hospitalizations were: . . .

**4x** Higher in Unvaccinated Adults Ages 18-49 years

**5x** Higher in Unvaccinated Adults Ages 50-64 years

**6x** Higher in Unvaccinated Adults Ages 65 Years and Older

https://covid.cdc.gov/covid-data-tracker/#covidnet-hospitalizations-vaccination (last visited May 2, 2022).

There are no guarantees, and breakthrough infections are a reality. It also remains true that the virus develops new variants, requiring that scientific and medical conclusions be revised. Given the current effectiveness of vaccines, however, I have often found vaccination to be a highly relevant consideration in assessing the risks associated with COVID-19 infection. (A recent example is *United States v. v. Jerez Matos*, No. CR 19-113 (KM), 2022 WL 702858, at *3 (D.N.J. Mar. 9, 2022).) *See also United States v. Turbides-Pena*, 2021 WL 2310093, at *3 (D.N.J. June 7, 2021) (Chesler, J.) ("Given that Defendant is fully vaccinated against Covid-19, the risk of that illness due to continued incarceration has been substantially reduced and does not constitute an extraordinary and compelling reason for a reduction in

sentence."); *United States v. Stewart*, 2021 WL 2134937, at *3 (D.N.J. May 25, 2021) (Wigenton, J.) (noting "with the vaccine's protection . . . Defendant's susceptibility to renewed serious illness seems unlikely"); *United States v. Shumate*, 2021 WL 2374621, at *2 (D.N.J. June 9, 2021) (Hillman, J.) (citing cases and noting "it is appropriate for courts to consider the vaccination status of a defendant when considering compassionate release motions").

I note separately that vaccination has been widespread at the institution where Mr. Martinez is incarcerated. At FCI Butner Medium I there are 730 inmates (546 within the FCI and 184 at an adjacent satellite camp). https://www.bop.gov/locations/institutions/but/ Total vaccination figures are published for the entire Butner complex, of which FCI Butner Medium I is only a part. BOP has fully vaccinated 1153 staff members and 3509 inmates. https://www.bop.gov/coronavirus/

### 3. Infection Rates at FCI Butner Medium I

I move on to consider the current likelihood of contracting COVID-19 at FCI Butner Medium I. Infections and deaths occurred, particularly in the early part of the pandemic. The medical records show that Mr. Martinez was at some point in protective quarantine, but his COVID-19 test results seem to have been negative. In early to mid-2021, the prison system finally turned the corner as vaccines became available.

Current and cumulative figures for COVID-19 infections at FCI Butner Medium I are as follows:

| Inmates Positive | Staff Positive | Inmate Deaths | Staff Deaths | Inmates Recovered | Staff Recovered |
|---|---|---|---|---|---|
| 0 | 2 | 11 | 0 | 148 | 165 |

https://www.bop.gov/coronavirus/

The "recovered" figures reveal that over the past two years there were large numbers of positive COVID test results among the inmates and staff. Tragically, there were 11 deaths. Currently, the facility reports zero positive test results among inmates, a better rate than in society at large.

In short, Mr. Martinez's personal medical situation, in isolation or in the

9

context of conditions at FCI Butner Medium I, does not support a finding of compelling and exceptional circumstances.

### a. § 3553(a) factors

Even if the circumstances were extraordinary, consideration of the factors under 18 U.S.C. § 3553(a) would weigh against an order of release. I have considered those factors, though I discuss them only briefly in light of the analysis above.

The offense is a serious one, involving trafficking in heroin. Since 1991, Mr. Martinez has compiled a record of six criminal convictions. Three involved distribution of controlled substances. There is also a history of violence, including a 1995 conviction for robbery, aggravated assault, and unlawful possession of a weapon; a 2002 conviction for robbery involving force; and a 2003 conviction for unlawful possession of a firearm. He has received lengthy prison sentences in the past, which have not deterred him from additional criminal conduct.

The goals of punishment, deterrence, and protection of the public remain paramount. It is unnecessary to elaborate on the harms inherent in heroin trafficking, violence against the person, or unlawful possession of weapons. Deterrence and protection of the public from such conduct remain important goals of Mr. Martinez's sentence. Release at the present time would severely compromise the legitimate goals of sentencing.

Even if Mr. Martinez's circumstances were extraordinary and compelling, which I do not find to be the case, compassionate release would be denied because it would not be consistent with the purposes of sentencing as set forth in 18 U.S.C. § 3553(a).[4]

---

[4] Mr. Martinez appears to argue in the alternative for transfer to home confinement. That application must be denied. The Court has no authority to grant such relief, which is reserved to the BOP under 18 U.S.C. § 3624(c)(2). *See United States v. Voda*, 994 F.2d 149, 151–52 (5th Cir. 1993); *Aigebkaen v. Warden*, No. 20-5732, 2020 WL 6883438, at *4 (D.N.J. Nov. 24, 2020) ("Pre-release placement decisions, such as transfers to home confinement, are committed to the BOP's sole discretion."). And if the court did possess the discretion to award such relief, it would not do so, for the reasons expressed above.

## **ORDER**

**IT IS THEREFORE** this 3rd day of May, 2022,

**ORDERED** that the motion for compassionate release (DE 72) is DENIED. The clerk shall send a copy of this opinion and order to the defendant/petitioner, Nicholas Martinez, by regular first-class mail.

/s/ Kevin McNulty
_____
**KEVIN MCNULTY, U.S.D.J.**